# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 24, 2013      Decided December 24, 2013

No. 13-3044

UNITED STATES OF AMERICA,
APPELLEE

v.

SIMON A. DILLON,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cr-00012-1)

*Christopher M. Davis*, appointed by the court, argued the cause for appellant. With him on the briefs was *Mary E. Davis*, appointed by the court.

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *G. Michael Harvey*, and *Fernando Campoamor-Sanchez*, Assistant U.S. Attorneys.

Before: KAVANAUGH and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

EDWARDS, *Senior Circuit Judge*: This appeal contests the District Court's order authorizing the Government to medicate Defendant-Appellant Simon Dillon, by force if necessary, for the sole purpose of rendering him competent to stand trial. We review this matter with a sobering awareness that requiring a person to take unwanted psychotropic medication entails a grave deprivation of a liberty interest protected by the Due Process Clause. *See Washington v. Harper*, 494 U.S. 210, 221 (1990) (noting that an individual "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs").

Our decision is largely controlled by *Sell v. United States*, where the Supreme Court held that the Government may, on "rare" occasions, forcibly medicate a defendant to restore his competency. 539 U.S. 166, 180 (2003). But to do so, the Government must establish, *inter alia*, (1) that the Government has an "*important*" interest in the prosecution that is undiminished by special circumstances and (2) that the proposed medication will "*significantly further*" this important interest. *Id.* at 180-81. The Government contends this case is one of the "rare" instances contemplated by *Sell*.

Dillon, who has a history of mental illness, was indicted for threatening the President in violation of 18 U.S.C. § 871. The District Court found him incompetent to stand trial and, upon the Government's motion for involuntary medication, conducted a *Sell* hearing in April 2013. The District Court determined that the Government carried its burden of establishing "that the *Sell* standards have been met and that involuntary medication is appropriate and necessary." *United States v. Dillon*, No. 12-CR-12 (JDB), 2013 WL 1859289, at *1 (D.D.C. May 3, 2013). This appeal followed.

Dillon argues that the District Court erred in failing to consider whether the possibility of his being civilly confined undermines the importance of the Government's prosecutorial interest under the first *Sell* factor. Br. of Appellant at 21-29. Dillon also argues that the District Court erred in neglecting to weigh that he is not a dangerous individual, a fact that he contends should be relevant because it diminishes the Government's interest in his prosecution. *Id.* at 18-21. Finally, Dillon contends that certain of the District Court's findings concerning his diagnosis were clearly erroneous. *Id.* at 29-43.

We reject Dillon's arguments and affirm. First, given the record in this case, we find no merit in Dillon's claim that the District Court committed reversible error in failing to consider the prospect that he might face civil confinement. Dillon did not argue to the District Court, as he does now, that he was likely to be civilly confined and that his probable confinement constituted a "special circumstance" weakening the Government's interest in prosecution. Dillon thus forfeited the argument, and any claim to plain error is thwarted by Dillon's repeated assertions that he is not dangerous, which undercut the likelihood that Dillon will be civilly confined. *See* 18 U.S.C. § 4246(d) (authorizing confinement only upon a showing that an individual's "release would create a *substantial risk* of bodily injury to another person or serious damage to property of another" (emphasis added)); D.C. CODE § 21-545(b)(2) (authorizing commitment only if a person is "likely to injure himself or others if not committed" and requiring the "*least restrictive* alternative consistent with the best interests of the person and the public" (emphasis added)). Second, even if Dillon is correct that he is not dangerous *apart from allegedly threatening the President with bodily harm*, this fact by itself would not render unimportant the Government's interest in prosecuting him for a serious and dangerous crime. Finally, we hold that the District

Court's factual findings have a sound evidentiary basis and are not clearly erroneous.

## I. BACKGROUND

Dillon, who has been repeatedly hospitalized for his mental illness, was indicted under 18 U.S.C. § 871 for threatening to inflict bodily harm upon the President. On December 10, 2011, he allegedly sent an e-mail to a United States Secret Service agent from a location three blocks away from the White House that stated that "no harm" would come to the President if he met with Dillon and agreed to "meet the demands of God." If these demands went unmet, the e-mail continued, the President would "get the worse [sic] Christmas present ever," "will suffer for 30 days," and "will wish for death, but death will not come to him."

The Secret Service arrested Dillon the next day. Following his detention, the D.C. Department of Mental Health sought his involuntary civil commitment. After an administrative hearing on January 5, 2012, the D.C. Mental Health Commission recommended that Dillon be committed on an outpatient basis. Dillon contested this recommendation before the D.C. Superior Court, which stayed the matter after criminal charges were filed.

On January 13, 2012, eight days after the D.C. Mental Health Commission had recommended outpatient civil commitment, a grand jury indicted Dillon under 18 U.S.C. § 871. Dillon was then arrested, and, shortly thereafter, the District Court ordered that he be committed to the care of the Attorney General for a competency determination pursuant to 18 U.S.C. § 4241.

Government doctors evaluated Dillon's competency on three separate occasions during pretrial proceedings and reached three distinct diagnoses. *First*, Drs. William J. Ryan and Elissa R. Miller evaluated Dillon at the Metropolitan Correctional Center. In a competency report issued in March 2012, Drs. Ryan and Miller diagnosed Dillon with Schizophrenia, Paranoid Type. Drs. Ryan and Miller nevertheless concluded that Dillon was competent to stand trial, albeit with the caveat that their opinion was offered "with less than the usual degree of psychological certainty" because Dillon was "unable to rationally consider an Insanity Defense to which he may be entitled."

*Second*, after both parties orally moved for further psychiatric evaluation, Dr. Heather H. Ross evaluated Dillon at Butner Federal Medical Center ("Butner"). In an August 2012 report, Dr. Ross diagnosed Dillon with Delusional Disorder, Grandiose Type. Dr. Ross further concluded that Dillon's mental illness rendered him incompetent to stand trial because it prevented him from assisting properly in his defense. The District Court then held a competency hearing and, consistent with Dr. Ross's recommendation, found Dillon incompetent to stand trial.

*Third*, after the District Court found Dillon incompetent, it ordered that he again be committed to the custody of the Attorney General, this time for a determination of whether, with treatment, there would be "a substantial probability that . . . [Dillon would] attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(1). Drs. Jill R. Grant and Jill C. Volin evaluated Dillon at Butner and authored a competency restoration study that they submitted to the District Court in February 2013. They diagnosed Dillon with Schizoaffective Disorder, Bipolar Type and concluded that Dillon remained incompetent to stand trial. Drs. Grant

and Volin also concluded that there was a substantial probability that Dillon could be restored to competence with antipsychotic medication. They based their conclusion on a number of studies estimating the rate at which psychotic defendants are successfully restored to competency. *See, e.g.*, Robert E. Cochrane et al., *The* Sell *Effect: Involuntary Medication Treatment Is a "Clear and Convincing" Success*, LAW & HUM. BEHAV. (2012), *reprinted in* Joint Appendix ("J.A.") 279-88; Bryon L. Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants with Delusional Disorder*, 35 J. AM. ACAD. PSYCHIATRY & LAW 47 (2007), *reprinted in* J.A. 289-301. In further support of their conclusion, Drs. Grant and Volin also pointed to Dillon's medical history that indicated that he had responded favorably to psychotropic medication during past hospitalizations.

Based on their findings, Drs. Grant and Volin requested a judicial order under *Sell* authorizing them to administer a course of involuntary antipsychotic medication to restore Dillon's competency. Drs. Grant and Volin stated that they sought authorization under *Sell* because Dillon did not meet the criteria for forcible medication articulated in *Harper*. *See* 494 U.S. at 227 (holding that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest").

Based on the February 2013 competency restoration study, the Government moved to have Dillon forcibly medicated. In April 2013, the District Court conducted a *Sell* hearing at which Drs. Grant and Volin testified as expert witnesses in the areas of clinical forensic psychology and

forensic psychiatry, respectively. Dillon also testified that a past diagnosis of psychosis was due to behavior induced by peyote, and that he suffered side effects in the form of depression and numbness in his extremities after he was administered Risperdal, an antipsychotic medication. Tr. of Hr'g (Apr. 17, 2013) at 127-29, *reprinted in* J.A. 184-86. Shortly after the hearing, the District Court issued its Memorandum Opinion authorizing involuntary medication. 2013 WL 1859289. As relevant to this appeal, the District Court found that the "government has an important interest in bringing defendant to trial" that is not undermined by "special circumstances," *id.* at *3-4, and that "involuntary medication will significantly further the government's interest in prosecuting defendant," *id.* at *7.

This court has jurisdiction to hear this appeal under 28 U.S.C. § 1291 because an order authorizing the administration of involuntary medication meets the "collateral order" exception to the usual rule that pretrial orders are not immediately appealable. *Sell*, 539 U.S. at 176-77.

## II. ANALYSIS

The parties do not dispute that the Supreme Court's decision in *Sell* largely controls the disposition of this case. They do not agree, however, on how the holdings of *Sell* should be applied to the facts of this case. We will therefore preface our analysis of the parties' claims with a close reading of *Sell* to determine the legal parameters that guide our decision.

The Supreme Court's decision in *Sell* relied on two of its prior decisions – *Harper* and *Riggins v. Nevada*, 504 U.S. 127 (1992) – to formulate the constitutional prerequisites to the

Government's involuntarily medicating a defendant to restore his trial competency. *Sell*, 539 U.S. at 177-79. In *Harper*, the Court concluded that an individual's liberty interest in avoiding forced medication, though "significant," could be overcome by the important state interest in "providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others." 494 U.S. at 221, 236. It was thus constitutionally permissible for the State of Washington to medicate a non-consenting inmate whose mental illness caused him to be a danger to himself or others in the prison environment. *Id.* at 225-26, 236. And in *Riggins*, the Court observed that, in addition to the governmental interest in mitigating an inmate's dangerousness, a state could forcibly medicate a defendant for the purpose of bringing him to trial. 504 U.S. at 135 ("[T]he State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication . . . by using less intrusive means.").

Relying on *Harper* and *Riggins*, the Supreme Court prescribed a detailed, four-part inquiry for district courts to undertake prior to authorizing involuntary medication to restore defendants to competency:

> First, a court must find that *important* governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. . . .

> Courts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest. . . .

Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. . . .

Third, the court must conclude that involuntary medication is *necessary* to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. . . .

Fourth, as we have said, the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition.

*Sell*, 539 U.S. at 180-81 (citations omitted).

In addition, the Court in *Sell* took pains to ensure that the four-part inquiry it announced would not be conflated with a *Harper* inquiry into whether an individual's dangerousness could justify the forcible administration of antipsychotic medication. *Id.* at 181-82. The Court instructed that "[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative [*Harper*] grounds *before* turning to the trial competence question." *Id.* at 182. By considering *Harper* grounds first, a court might obviate the need to conduct the more difficult inquiry under *Sell*, and "[e]ven if a court decides medication cannot be authorized on the alternative

grounds, the findings underlying such a decision will help to inform expert opinion and judicial decisionmaking in respect to a request to administer drugs for trial competence purposes." *Id.* at 183. Trial courts should thus "ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on these other *Harper*-type grounds; and, if not, why not." *Id.*

In this case, the District Court conducted an analysis pursuant to *Sell* after Drs. Grant and Volin reported that Dillon did not meet the criteria for forcible medication articulated in *Harper*. And the Government does not contend that Dillon was a danger to himself or others while incarcerated and, thus, should be forcibly medicated pursuant to *Harper*. Given this record, the focus of our decision will be on the dictates of *Sell*, not *Harper*.

## A. *Standards of Review and Proof*

The Supreme Court in *Sell* did not prescribe a standard of appellate review, and this circuit has yet to address the matter. Most of our sister circuits conduct *de novo* review of a district court's holding that the Government's interest is "important" under the first prong of *Sell*, and assess a district court's remaining *Sell* findings for clear error. *See United States v. Fazio*, 599 F.3d 835, 839 (8th Cir. 2010) (noting the "overwhelming majority of courts" adopting this approach); *see also United States v. Diaz*, 630 F.3d 1314, 1331 (11th Cir. 2011); *United States v. Green*, 532 F.3d 538, 546, 552 (6th Cir. 2008); *United States v. Hernandez-Vasquez*, 513 F.3d 908, 915-16 (9th Cir. 2007) (as amended Jan. 22, 2008); *United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007); *United States v. Evans*, 404 F.3d 227, 236, 240 (4th Cir. 2005); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004). *But see United States v. Bradley*, 417 F.3d 1107, 1113-

14 (10th Cir. 2005) (concluding that second *Sell* factor, in addition to the first, is a "legal question" to be reviewed *de novo*).

We adopt the approach taken by the majority of circuits. *See Hernandez-Vasquez*, 513 F.3d at 915 (following the majority's approach of reviewing the second *Sell* factor for clear error, instead of the Tenth Circuit's approach, because the question of whether medicating a defendant would "significantly further" the Government's interest "typically involves substantial questions of fact"). We thus review *de novo* the District Court's conclusion that the Government has an important interest in prosecuting Dillon, and consider whether the balance of the District Court's findings are clearly erroneous.

We hasten to add one qualification, however. To the extent that the District Court's determination under the first prong of *Sell* depends on findings of fact, *see Sell*, 539 U.S. at 180 ("Courts . . . must *consider the facts of the individual case* in evaluating the Government's interest in prosecution." (emphasis added)), we review those findings under a clear-error standard. *See Evans*, 404 F.3d at 236 (observing that although the Fourth Circuit's review under the first prong of *Sell* is *de novo*, "review [of] any factual findings relevant to this legal determination [is] for clear error"); *see also United States v. Mikulich*, 732 F.3d 692, 696 (6th Cir. 2013).

The Supreme Court also did not establish the burden of proof to be applied to *Sell* determinations. Noting the absence of controlling authority in our circuit, the District Court concluded that the Government was required to establish each *Sell* factor under a clear and convincing standard of proof, adopting the approach taken by other courts of appeals. *Dillon*, 2013 WL 1859289, at *1 n.1 (citing *United States v.*

*Bush*, 585 F.3d 806, 814 (4th Cir. 2009); *Green*, 532 F.3d at 545 n.6). The Government has not disputed this conclusion, and Dillon has not advocated for a higher burden.

We agree with the District Court's approach and join our sister circuits in holding that factual determinations under *Sell* must be supported by clear and convincing evidence. *See Diaz*, 630 F.3d at 1331 ("Other circuit courts that have considered this issue uniformly concluded that in *Sell* cases the government bears the burden of proof on factual questions by clear and convincing evidence."); *United States v. Chatmon*, 718 F.3d 369, 374 (4th Cir. 2013); *Fazio*, 599 F.3d at 840 n.2; *Bradley*, 417 F.3d at 1114; *Gomes*, 387 F.3d at 160. Holding the Government to a clear and convincing standard of proof affords due regard to the nature of the liberty interest at stake in forced-medication cases. *See United States v. White*, 620 F.3d 401, 422 (4th Cir. 2010) (Keenan, J., concurring) (noting "the physical violence inherent in forcible medication" and that "forcible administration of drugs necessarily requires a substantial and degrading intrusion of the body").

## B. *The First* **Sell** *Factor*

Dillon begins by challenging the District Court's determination under the first *Sell* factor that "*important* governmental interests are at stake" in his prosecution. 539 U.S. at 180. A proper analysis of this first factor addresses two distinct questions. A court must first determine whether the charged crime is "serious," because the Government's interest in a prosecution generally qualifies as "important" when the defendant is charged with a serious crime. *Id.* Next, considering the specific facts of the case before it, a court must evaluate whether "[s]pecial circumstances . . . lessen the importance of that interest." *Id. Sell* lists two examples of

special circumstances: an extended period of pretrial detention and the prospect of lengthy civil confinement. *Id.*

Observing that Dillon had conceded the seriousness of his alleged offense, the District Court concluded that the Government's interest in prosecuting him was "important." 2013 WL 1859289, at *3. Turning to the second part of the analysis, the District Court considered, and rejected, Dillon's argument that his pretrial confinement undercut the Government's interest. *Id.* at *3-4. The District Court did not consider the prospect that Dillon might face a lengthy civil confinement because Dillon "did not make such an argument." *Id.* at *3 n.7. Nor did the District Court consider any other special circumstance. *Id.* at *3-4.

Dillon continues to concede on appeal that the charged crime is "serious" under *Sell*. Br. of Appellant at 18. In light of Dillon's concession, we need not wade into the debate among our sister circuits about whether the seriousness of a crime is measured by the statutory maximum or the likely guideline sentence, or both. *Compare United States v. Valenzuela–Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007) (examining both the statutory maximum and the likely guideline sentence to determine whether a crime is "serious"), *with Evans*, 404 F.3d at 238 (4th Cir. 2005) (concluding that focusing on a defendant's probable guideline range would be "unworkable"). However, Dillon argues that the District Court erred by failing to consider two "special circumstances" that he claims diminish what would otherwise qualify as an important governmental interest in his prosecution. The first special circumstance, he contends, is the prospect of his civil confinement. Br. of Appellant at 21-29. The second is his own purported non-dangerousness. *Id.* at 18-21. We consider each argument in turn.

1. *Possibility of Lengthy Confinement Resulting from Civil Commitment*

As noted above, *Sell* makes clear that a district court may appropriately consider the likelihood of a defendant's civil confinement in determining whether to order the forcible medication of a defendant to restore his competency to stand trial. On this point, the Court pointed out that "[t]he potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." *Sell*, 539 U.S. at 180. This is unsurprising because a "defendant's failure to take drugs voluntarily . . . may mean lengthy confinement in an institution for the mentally ill—and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id*. Here, the District Court declined to analyze the issue or make a finding concerning the likelihood of civil confinement. Dillon now contends this was error.

To begin with, the District Court correctly concluded that Dillon failed to raise this argument during its proceedings. In his opposition to the Government's motion for involuntary medication, Dillon identified his pretrial custody and his purported non-dangerousness as "special circumstances" undermining the prosecutorial interest; he did not mention the prospect of civil confinement. Def.'s Opp'n to Involuntary Medication, *reprinted in* J.A. 12-21. And Dillon failed to pursue the point during arguments before the District Court, even though the Government mentioned the issue in its brief and at argument. *See* Gov't's Mem. at 18, *reprinted in* J.A. 39; Tr. of Oral Arg. (Apr. 26, 2013) at 13-14, *reprinted in* J.A. 212-13. The issue was never joined.

It is also important to note that the District Court did not in any way *foreclose* Dillon from arguing the civil-

commitment point or from introducing evidence that his confinement was likely. Thus, Dillon had ample opportunity to cross-examine the Government's witnesses and to call his own. Tr. of Hr'g (Apr. 17, 2013) at 25, 95, 136, *reprinted in* J.A. 82, 152, 193. In short, the record provides no basis for Dillon's statement to this court that the District Court "foreclosed consideration" of civil commitment. *See* Br. of Appellant at 27 n.8.

Under our well-established precedent, Dillon's civil-confinement argument was forfeited when he failed to raise it with the District Court. *See, e.g.*, *Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal." (quoting *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984))). Because Dillon did not argue the point before the District Court, and because the District Court did not address it, we generally inquire no further into the matter. *See Dyson v. District of Columbia*, 710 F.3d 415, 419 (D.C. Cir. 2013).

At oral argument before this court, however, counsel for Dillon asked us to review the District Court's omission for plain error. Under Federal Rule of Criminal Procedure 52(b), we can correct unpreserved error only when there is (1) "error," (2) that is "plain," and (3) that "affects substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993) (alteration omitted). If all three conditions are met, we may "notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quoting *Olano*, 507 U.S. at 732). *See generally* EDWARDS, ELLIOTT & LEVY, FEDERAL STANDARDS OF REVIEW ch. VIII (2d ed. 2013).

*Sell* leaves little doubt that the prospect of a defendant's lengthy civil confinement is a focal point of the "special circumstances" analysis. 539 U.S. at 180. However, even if the District Court plainly erred when it declined to analyze the possibility of civil confinement, this omission did not affect Dillon's substantial rights under the third prong of *Olano* because Dillon has not shown "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (quotation and alteration omitted); EDWARDS, ELLIOTT & LEVY, *supra*, at 105. We rest this conclusion on the record and on Dillon's own arguments: First, the record as it stands offers insufficient support for the proposition that Dillon is likely to be civilly *confined* (as opposed to committed as an outpatient); and, second, Dillon's consistent assertions that he is *not* dangerous serve only to dilute any argument that Dillon is likely to be civilly confined. We amplify these two points below.

The record before us does not support a finding that Dillon is likely to be civilly *confined*. Although the *Sell* Court mentioned "civil commitment," it is clear from the context that the Court was concerned with the prospect of civil confinement. *See* 539 U.S. at 180 ("The defendant's failure to take drugs voluntarily . . . may mean lengthy *confinement* . . . that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." (emphasis added)). The D.C. Mental Health Commission recommended to the D.C. Superior Court that Dillon be civilly committed on an *outpatient* basis. Gov't Mem. at 12, *reprinted in* J.A. 33. Even though this report does not appear in the record, we know from the applicable statute that the Commission can recommend commitment only after finding that Dillon was "mentally ill, and because of the illness is

likely to injure himself or other persons if not committed." D.C. CODE § 21-544. But we also know that the Commission recommended *outpatient* treatment, which indicates that the Commission considered Dillon's risk to the public at large to be minimal. *See* D.C. CODE § 21-545(b)(2) (authorizing the D.C. Superior Court to commit a mentally ill person to "the Department or to any other facility, hospital, or mental health provider that the Court believes is the *least restrictive alternative consistent with the best interests of the person and the public*" (emphasis added)).

Although Dillon asserts that his outpatient status will be revoked if and when he does not take his medication, Br. of Appellant at 26-27, the applicable statute makes clear that revocation of an individual's outpatient status requires a judicial finding that "*a more restrictive treatment alternative is required to prevent the person from injuring himself or others.*" D.C. CODE § 21-548(a) (emphasis added). Simply put, Dillon's *outpatient* civil commitment does not imply that civil *confinement* is probable, as there would have to be a judicial finding by clear and convincing evidence that his confinement is "required to prevent [Dillon] from injuring himself or others." *Id.*

Furthermore, Dillon's own assertions critically weaken his civil-confinement argument. Beginning with his opposition to the Government's motion before the trial court, Dillon has consistently stated that he poses no significant danger to himself or others. *See* Def.'s Opp'n to Involuntary Medication at 6, *reprinted in* J.A. 17 ("Dillon has no history of violence . . . ."); Tr. of Oral Arg. (Apr. 26, 2013) at 32, *reprinted in* J.A. 231 ("Nobody thinks [Dillon is] particularly dangerous to himself or others . . . ."); Br. of Appellant at 18-19, 24, 27. Assuming that Dillon is correct that he presents, at most, a minimal risk to himself or others, this fact would

make it *less* likely that Dillon will be confined. *See* 18 U.S.C. § 4246(d) (authorizing civil confinement when a "court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release *would create a substantial risk of bodily injury to another person or serious damage to property of another*" (emphasis added)); D.C. CODE § 21-545(b)(2) ("If the Court or jury finds that the person is mentally ill and, because of that mental illness, *is likely to injure himself or others if not committed*, the Court may order the person's commitment to the Department or to any other facility, hospital, or mental health provider that the Court believes is *the least restrictive alternative consistent with the best interests of the person and the public*." (emphasis added)).

Dillon's plain-error challenge thus fails for want of showing a "reasonable probability" that, but for the District Court's failure to consider civil confinement, Dillon would not be subject to involuntary medication. The record before us does not offer a basis for finding that Dillon is dangerous enough to lead to his being civilly *confined* (as opposed to committed as an outpatient). *See* Br. of Appellant at 22 ("Obviously, the level of appellant's dangerousness was marginal; otherwise the D.C. Mental Health Commission would not have recommended commitment to an outpatient treatment program."). And Dillon's consistent claims that he is *not* dangerous undercut the notion that a better developed record would be any different.

### 2. *Dillon's Purported Non-dangerousness*

Dillon argues that he is not dangerous and that this fact undermines the Government's interest in prosecuting him. He further argues that because the District Court "did not believe dangerousness should be considered at all, the matter should

be remanded for fact development." Br. of Appellant at 21. Citing other circuits' decisions finding that a defendant's dangerousness is relevant, Dillon reasons that "if dangerousness bolsters the government's interest under *Sell*, the lack thereof must have the opposite effect." *Id.* at 19-20 (citing *United States v. Mackey*, 717 F.3d 569, 575 (8th Cir. 2013); *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 694 n.6 (9th Cir. 2010); *Gomes*, 387 F.3d at 160). Dillon also presses the obvious point that if he was dangerous he would not have been civilly committed on an outpatient basis by the D.C. Mental Health Commission. *Id.* at 22.

We first dispose of the Government's primary rejoinder to these arguments. The Government asserts that lack of dangerousness can never be considered to undermine the importance of the Government's interest in prosecution because the *Sell* framework applies *only after* there has been a predicate determination that a defendant is not dangerous. Br. for Appellee at 34-39. That is, in the Government's view, the Supreme Court's suggestion that courts sequence *Harper* determinations before *Sell* determinations necessarily implies that all defendants who make it to a *Sell* hearing are, by definition, not dangers to society. On this view, then, the *Sell* framework admits consideration of dangerousness "in only two specific contexts": (1) when assessing the likelihood of civil commitment and (2) when evaluating the "characteristics of the *crime* and whether the sentence for that crime reflects a legislative determination that persons who commit it typically present a serious risk to the safety of the community." *Id.* at 36-38 (internal quotation marks omitted).

The Government's argument misapprehends the nature of the *Sell* inquiry. The "result of [a] *Harper* hearing . . . establishes only that [a defendant] does not pose a danger to himself or others *while confined* in the institutional context.

[It does] not address whether [the defendant] might pose a danger to himself or others *if released*." *Ruiz-Gaxiola*, 623 F.3d at 694 n.6 (citation omitted). It is simply incorrect, then, to say that a court must assume that any defendant who reaches the *Sell* inquiry poses no danger to society. It may be that some persons who pose a danger to themselves or others *while confined* might also pose a danger to themselves or others *if released*, but the latter does not necessarily follow from the former. The Government has cited no meaningful studies or other evidence to show that the two propensities are coterminous.

More fundamentally, the Government seeks to impose a formalism and rigidity at odds with the sensitive balancing required by *Sell* in light of the significant liberty interests implicated by forcible medication. The Supreme Court crafted a sensitive and fact-specific inquiry, stating that "[c]ourts . . . must consider *the facts of the individual case* in evaluating the Government's interest in prosecution." 539 U.S. at 180. And the examples the Court listed (pretrial and future civil confinement) are just that – examples. *Id.*; *see also United States v. Grigsby*, 712 F.3d 964, 969-70 (6th Cir. 2013); *White*, 620 F.3d at 412.

At bottom, Dillon makes a common-sense argument: The dangerousness of a defendant surely may affect the strength of the governmental interest. This is indisputable. The Government has an interest in incapacitating individuals who endanger the public, *see United States v. Weston*, 255 F.3d 873, 880-82 (D.C. Cir. 2001), and thus its interest in a particular prosecution may be stronger in the case of a dangerous defendant than in a case that involves a defendant who is not dangerous. The simplicity of Dillon's argument is attractive, but the argument is shortsighted. It is one thing to acknowledge that the Government often has a strong interest

in prosecuting persons who appear to be dangerous, but it is quite another to say that the Government's interest in incapacitating a dangerous defendant is necessary to the Government's interest qualifying as "important" under the first *Sell* factor. As we observed in *Weston*, a bundle of governmental interests are implicated in any given prosecution. *Id.*; *cf.* 18 U.S.C. § 3553(a)(2) (listing three purposes of sentencing distinct from the need to protect the public by incapacitating a defendant, including, *e.g.*, the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense").

Dillon's argument also fails to acknowledge that, although a defendant's dangerousness may be relevant to the Government's interest in prosecuting him, courts are necessarily constrained in their fact-finding by the nature of the charges for which a defendant has been indicted. This case is a perfect example. Dillon has been charged with a crime under 18 U.S.C. § 871 – "threat[ening] to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States" – that is both serious and involves significant danger. To permit a *Sell* hearing to focus on the underlying criminal charges would risk converting the *Sell* inquiry into a mini-trial on the merits. In other words, in response to the Government's request for authorization to medicate Dillon so that he is competent to stand trial, the District Court would be required to first adjudicate the merits of the indictment to assess Dillon's dangerousness. This would make little sense.

In these circumstances, this court is hard pressed to give credit to a claim that Dillon's alleged lack of dangerousness is a special circumstance that meaningfully weighs against the Government's interest in pursuing prosecution. Dillon has been charged with a serious and dangerous crime. The only

way to determine whether he is guilty beyond a reasonable doubt, and thus dangerous as charged, is to allow the Government to proceed with prosecution. However, Dillon is incompetent to stand trial sans medication, so we cannot determine his dangerousness until his competence has been restored and there has been a trial on the merits.

We thus conclude that it is unnecessary to remand the case for further fact-finding with respect to Dillon's purported non-dangerousness. The necessary implications of the indictment in this case preclude a finding that Dillon is harmless. The grand jury indicted Dillon for threatening to inflict bodily harm upon the President. Indictment, *reprinted in* J.A. 9-10. Even assuming that Dillon is *harmless in other respects*, the District Court could not find that Dillon poses no danger to the President without a full trial on the merits of the criminal charges. As a result, we hold that the District Court correctly concluded that the Government established an important interest in prosecuting Dillon.

## C. *The District Court's Remaining Findings*

Dillon also argues that the District Court's findings are clearly erroneous. Br. of Appellant at 29-43. A trial court's findings of fact are entitled to a presumption that they are correct, *see Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984), and we will displace them only if (1) the findings are "without substantial evidentiary support or . . . induced by an erroneous application of the law"; or if (2) "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *Cuddy v. Carmen*, 762 F.2d 119, 124 (D.C. Cir. 1985) (quotations and citations omitted). *See generally* EDWARDS, ELLIOTT & LEVY, *supra*, ch. II.

Dillon's principal contention, it appears, is a two-step challenge to the District Court's finding under the second *Sell* factor – *i.e.*, that medication is substantially likely to restore his competency *and* substantially unlikely to have side effects that will interfere with his ability to assist in his defense. First, Dillon asserts that his diagnosis of Schizoaffective Disorder is erroneous and that he instead suffers from Delusional Disorder, as Dr. Ross opined. Br. of Appellant at 33-37, 42. Second, he argues that the success rate for treating Delusional Disorder is too low to warrant forced medication, *i.e.*, that the medication is not *substantially likely* to restore his competency. *Id.* at 38-41. We find no merit in either argument.

The District Court reasonably credited the Grant-Volin diagnosis over the previous two because Drs. Grant and Volin observed Dillon for a longer period than did the other doctors, and because they had more information at their disposal. 2013 WL 1859289, at *8 n.13. None of the arguments raised by Dillon – including that the diagnostic criteria have changed – cause us to question the validity of Drs. Grant and Volin's professional judgment that Dillon suffers from Schizoaffective Disorder, Bipolar Type. To the contrary, there is ample evidence that Dillon is afflicted by a mood disorder, which offers a basis to diagnose Dillon with Schizoaffective Disorder instead of with Delusional Disorder. *See, e.g.*, Tr. of Hr'g (Apr. 17, 2013) at 17, 21, 30, *reprinted in* J.A. 74, 78, 87.

Even if Dillon were correct that he suffers from Delusional Disorder, the District Court's finding of a substantial likelihood of restored competency would not be clear error. The Cochrane Study found that 73.3% of defendants with Delusional Order were restored to competency. Cochrane, *supra*, at 7 tbl. 4, *reprinted in* J.A.

285. And, more importantly, the competency restoration study found that Dillon would respond well to antipsychotic medication in part because "his psychotic symptoms have responded favorably to medication in the past." 2013 WL 1859289, at \*5 (quoting Drs. Grant and Volin's competency restoration study at 31).

Finally, there is no merit to the claim that the District Court erred in finding that the medication was substantially unlikely to have side effects that would interfere with Dillon's trial defense. This claim is based on Dillon's testimony that medication he took during a prior hospitalization made him depressed. Br. of Appellant at 42 & n.18. But as the District Court observed, "Dr. Volin testified that any sadness or depression that defendant experienced was a *symptom* of his mental illness, not a side effect of antipsychotic medication." 2013 WL 1859289, at \*6 (emphasis added) (citing Tr. of Hr'g (Apr. 17, 2013) at 86-88, *reprinted in* J.A. 143-45).

### III. CONCLUSION

For the reasons stated above, we affirm the District Court's order authorizing involuntary medication.