WILKINS, Circuit Judge,
dissenting in part and concurring in part:
I must depart from the Court’s opinion concluding that three of the District Court’s factual findings were clearly erroneous, but I agree that the Government has proven that Hallford’s statements were voluntary under the Fifth Amendment’s Due Process Clause.
• The Court’s opinion' ably láys out the sequence of events that led to Hallford’s interaction with Secret Service Agents Fox and Maher (collectively “the agents”), and I need not repeat that background here. However, the Court’s focus solely on the evidence that undermines the District Court’s factual findings represents, in my respectful view, its failure to adhere to the deferential standard of review we employ when evaluating a District Court’s factual findings. After all,
A trial court’s findings of fact are enti-tied to a presumption that they are correct, and we will displace them only if (1) the findings are “without substantial evidentiary support or ... induced by an erroneous application of the law”; or if (2) “on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.”
United States v. Dillon, 738 F.3d 284, 297 (D.C.Cir.2013) (alteration in original) (quoting Cuddy v. Carmen, 762 F.2d 119, 124 (D.C.Cir.1985)). Accordingly, “we may not reverse a trial court’s factual findings ‘even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.’” Barhoumi v. Obama, 609 F.3d 416, 423 (D.C.Cir.2010) (quoting Anderson v. Bes *861 semer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). “In evaluating a- challenge to a district court’s factual findings, ‘we do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole.’” Id. at 424 (quoting Awad v. Obama, 608 F.3d 1, 7 (D.C.Cir.2010)). Considering this deferential standard of review, I cannot conclude that the District Court clearly erred in finding that the agents summoned Hall-ford for an interview, that the agents used deception in conducting their interview, or that the agents did not dispel Hallford’s belief that the interview was necessary for his release.[1]
Take, for instance, the District Court’s finding that Hallford “was summoned by agents for an interview, not'asked if he would submit to an interview.” A. 685.[2] Considering all the evidence, taken as a wholé, the District Court’s finding is not clearly erroneous. The majority relies on Agent Fox’s asking Hallford if the agents could speak to him about statements. he made at George Washington Hospital (“GW’). Maj. Op. at 857. However, Agent Fox’s testimony also reveals that although United Medical Center (“UMC”) personnel escorted Hallford to the interview, the personnel did so only upon the agents’ request:
Q. What" did you do when you got to United Medical?
A. We parked out front. We walked in, again, to the visitors’ lounge, to the check-in desk, and identified ourselves to the clerk at the desk.
Q. What happened?
A. We identified ourselves. We explained why we were there. And they reached out to the security department.
Q. Did you ask to interview Mr. Hall-ford?
A. Yes.
Q. And' did they indicate in any way that they were going to try to make that happen?
A. They told us that they would reach out to the security department and—and that if we just waited there, that they would—someoné would be there to assist us.
A. 196. Thereafter, UMC security officers escorted the agents to a secure area of the fourth floor of the hospital where they subsequently entered a hallway. Agent Fox explained their entry in this manner: “We went into "the hallway arid, as we went into the hallway, there was an open door in front of ús, and a hospital staff person was standing there, and then in walked two or three hospital 'staff, along with Mr. Hallford.” A. 197. The hallway was not patient accessible. ' Furthermore, Agent Fox’s testimony Suggests that UMC personnel deferred to the agents because “[t]hey just'looked at [the agents] and said ... do you want to go in this room right here? And [the agents] just followed. [The agents] said, okay.” A. 197. Agent Fox was the last person to enter the interview room. There was no evidence regarding what language the UMC personnel" used in escorting Hallford to the interview. Finally, Agent Fox never informed Hallford that he was free to leave or that he was free to terminate the interview. Taking all this evidence as a whole, I am not left with the “definite and *862 firm conviction” that the District Court erred in concluding that the agents summoned Hallford for an interview. Dillon, 738 F.3d at 297 (quoting Cuddy, 162 F.2d at 124).
The District Court also found that Hall-ford “fell into [the agents’] trap,” A. 688, and that the agents “effectively snooker[ed] [him] into an admission of gun possession in the District of Columbia, after .satisfying themselves that he was no threat to anyone protected by the U.S. Secret Service or any of its employees,” A. 692. The District Court concluded that the questions were “calculated to possibly result in a self-incriminating admission about gun ownership and the whereabouts of those guns.” A.'688.
Agent Fox testified that the agents asked Hallford if they could speak to him about, the statement? he made while at GW. The agents planned their questioning around a use of a standard form that touched .on information of interest to the agents, including weapon ownership. As a result, near the end of the interview, the agents asked Hallford if he owned any weapons. The agents’, reliance on a standard form suggests that they knew in advance that they would ask questions of Hallford about topics other than, the statements Hallford made at GW. Accordingly, there is substantial evidence to support the District Court’s finding that the agents used deception in questioning Hallford. ,
Additionally, the District' Court also found there- was “no question that the agents never did anything to dispel any belief on [Hallford’s] part that the interview was required, and that if he was going to leave that hospital, he would need their blessing.” A. 690. The majority appears to implicitly reject this finding by dismissing its import, relying on the District Court’s equivocation about whether Hallford actually possessed this belief. See Maj. Op. at 859. However, the District Court heard testimony from Dr. John O’Brien, who was tendered without objection as an expert in the field of forensic psychiatry, and his expert report was admitted by the court. Dr. O’Brien testified that Hallford “was an individual who perceived that the Secret Service would help him get out of the hospital. Obviously he wanted to leave the next day himself.” A. 482. Dr. O’Brien also testified that Hallford “was significantly vulnerable to being seduced into speaking with him thinking that they were his ticket out,” particularly in light of “the recurrently and consistently documented psychiatric symptoms he was exhibiting, his physically debilitated state and the fact tfiat he had not yet been afforded appropriate psychiatric treatment.” A. 482-83. Nothing in the record disputes Dr. ’ O’Brien’s conclusion. The government did not object to Dr." O’Brien’s testimony at the time it was proffered, nor does the Government challenge whether Hallford possessed this belief. There is no evidence in the record that the agents did anything to dispel such a belief. Given the evidence as a whole, and the lack of any challenge by the Government, I cannot conclude that the District Court’s finding is clearly erroneous.
Despite my conclusion that three of the District Court’s findings were not clearly erroneous, I agree with the Court that Hallford’s statements were voluntary. Whether a confession is voluntary is a legal question we review de novo. United States v. Reed, 522 F.3d 354, 358 (D.C.Cir. 2008). The Government must prove that Hallford’s confession was voluntary by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Although this is a close, case, I believe the Government has done so here.
*863 “A confession is inadmissible as a matter of due process if under the totality of the circumstances it was involuntarily obtained....” Reed, 522 F.3d at 358-59 (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C.Cir.1991)). “Voluntariness turns on whether the ‘defendant’s will was overborne’ when he gave his statement, and the test for this is whether the statement was a ‘product of-an essentially free and unconstrained choice by its maker.’ ” United States v. Murdock, 667 F.3d 1302, 1305 (D.C.Cir.2012) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). A defendant’s mental condition is a relevant factor in determining whether á confession was voluntary, but “this fact does not justify a conclusion that a defendant’s mental condition, by itself and apart from its relation to official- coercion,- should ever dispose of the inquiry into constitutional ‘voluntariness.’” Colorado v. Connelly, 479 U.S, 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Accordingly, “coercive police activity is a necessary predicate to the finding that a confession is not ‘voluntary.’” Id. at 167, 107 S.Ct. 515. Coercive activity includes “trickery, -psychological pressure, or mistreatment.” Withrow v. Williams, 507 U.S. 680, 708, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (O’Connor, J., concurring in part and dissenting in part). Furthermore, whether -Miranda warnings were given is a relevant factor but “does not ... dispense with the voluntariness inquiry.” Dickerson v. United States, 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). “Determination of whether a statement is involuntary ‘requires more than a mere color-matching of cases.’ It requires careful evaluation of all the circumstances of the interrogation.” Mincey v. Arizona, 437 U.S. 385, 401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting Reck v. Pate, 367 U.S. 433, 442, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961)). Thus, we must consider “both the characteristics of the accused and the details of the interrogation.” Dickerson, 530 U.S. at 434, 120 S.Ct. 2326 (quoting Schneckloth, 412 U.S. at 226, 93 S.Ct. 2041). Relevant factors include “the defendant’s age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning.” Murdock, 667 F.3d at 1305-06 (citing Schneckloth, 412 U.S. at 226, 93 S.Ct. 2041).
A review of our precedent prevents me from concluding that Hallford’s statements were involuntary. Wé have suggested that “egregious facts [are] necessary to establish that the statements ... made during questioning [are], involuntary.” United States v. Mohammed, 693 F.3d 192, 198 (D.C.Cir.2012). Statements made where the circumstances are less than “egregious” are usually voluntary. For example, in United States v. Reed, we found a confession voluntary where the defendant claimed to be suffering withdrawal symptoms at the time of the interrogation and the police placed the defendant in a jumpsuit without, any underwear. 522 F.3d 354, 358-59 (D.C.Cir.2008). Likewise, we found a Miranda waiver voluntary in.United States v. Yunis, where the defendant was questioned over a period of four days, suffered from seasickness in a “hot and cramped detention room,” and • lacked any familiarity with his Miranda rights prior to being informed and signing a written waiver. 859 F.2d 953 (D.C.Cir.1988). In Berghuis v. Thompkins, the Supreme Court noted that there is nothing “inherently coercive”, about an interrogation that lasts three hours while a defendant sits in a straight-backed chair to render involuntary statements given subsequent to a Miranda warning. 560 U.S. *864 370, 387, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).
Similarly, where the Supreme Court has found statements involuntary, the circumstances surrounding the interrogation have been much worse than those here. In Mincey v. Arizona, the defendant was suffering “unbearable” pain from a gunshot wound while unable to speak because of a tube in his mouth; he also could not provide coherent answers to questions, and he asked for a lawyer repeatedly over the course of a four-hour interrogation. 437 U.S. at 396-401, 98 S.Ct. 2408. In Blackburn v. Alabama, the defendant endured an eight-to nine-hour interrogation in a small room surrounded by three police officers and “was insane and incompetent at the time he allegedly confessed.” 361 U.S. 199, 204, 207, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). Hallford’s circumstances do not come close to those of Mincey and Blackburn. Although Hallford was suffering from mental illness, he was interrogated in the company of doctors and nurses. His interview lasted less than an hour, and the agents spoke to Hallford'in conversational tones. Hallford appeared calm and exhibited no signs of physical or emotional distress. He provided responsive answers' to the ágents’ questions. And the coercive conduct here does not suggest that" the agents “threated or injured [Hallford] during the interrogation or that he was in any way fearful.” Berghuis, 560 U.S. at 386, 130 S.Ct. 2250. “Indeed, even where interrogations of greater duration were held to be improper, they were accompanied ... by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats.” Id. at 387, 130 S.Ct. 2250. While such circumstances may not be necessary to find a due process violation, there are no sufficiently analogous circumstances present here.
Certainly, the circumstances of this case give me pause, and although the voluntariness determination is “more than a mere color-matching of cases,” Mincey, 437 U.S. at 401, 98 S.Ct. 2408 (citing Reck, 367 U.S. at 442, 81 S.Ct. 1541), precedent must nonetheless guide our decision-making. This is a problem for Hallford, because notably absent from his brief are cases where courts found statements involuntary under sufficiently analogous facts. While some circumstances here weigh against the government’s claim that Hallford’s statements were voluntary, none evoke the kind of egregious conduct or governmental coercion that has led prior courts to find statements involuntary. The agents did not inform Hallford of his Miranda rights, but this failure is not outcome determinative. See Dickerson, 530. U.S. at 444, 120 S.Ct. 2326. Although the agents misled Hallford about the scope of their questioning, their misrepresentation was not the type of false promise of leniency that may render statements involuntary. See Murdock, 667 F.3d at 1307. But cf. Colorado v. Spring, 479 U.S. 564, 576-77, 577 n. 8, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (reserving the question of whether an affirmative misrepresentation about the scope of an interrogation would render a Miranda waiver involuntary). The manner in which Hallford was brought to be questioned is also disconcerting—the hospital staff were acting at the will of the agents, there is no evidence that the staff asked Hallford if he wished to meet the agents, and Hallford was suffering from mental illness—but his mental illness, “by itself and apart from its relation to official coercion” does not determine whether his statements were voluntary. Connelly, 479 U.S. at 164, 107 S.Ct. 515. And while Hallford may have believed that the agents who arrived to question him about his prior statements would be able to help secure his release if only he would talk to *865 them, there is no evidence in the record that the agents caused this belief, only, that they benefited from it.
Finally, and most tellingly, when the agents asked if they could search Hall-ford’s car and review his medical records, Hallford declined. As the goyernment argues, Hallford’s refusal to consent to these searches undermines any suggestion that his will was “overborne” at the time he spoke with the agents. See United States v. Cooper, 499 F.2d 1060, 1064 & n. 11 (D.C.Cir.1974) (concluding statements were voluntary, in part, because defendant “exercised some of his rights by refusing to sign [a Miranda waiver] and by indicating he might decline to answer some questions”); see also United States v. Khan, 461 F.3d 477, 497 (4th Cir.2006) (statements voluntary, in part; because defendant “freely answered some questions and declined to answer, others); United States v. Graham, 982 F.2d 273, 275 (8th Cir.1992) (evidence “not reflective of an overborne will” when' defendant, during a search, “answered some questions” but “dodged questions about her identity” and “refused officers’ request to search her luggage”); cf. Yunis, 859 F.2d at 963 (noting that courts “look to a defendant’s behavior to determine the extent of his distress” when determining whether statements are voluntary). Under the totality of the circumstances, and in light of this precedent, I conclude that the Government has met its burden to prové that Hallford’s statements were voluntary by a preponderance of the evidence.
However, given the majority’s conclusion that the District Court’s findings were clearly erroneous, I agree that we should remand the remaining Miranda question back to the District Court.

. I concur with my colleagues that the District Court clearly erred in finding that the agents did not ascertain Hallford’s physical condition for the reasons stated in the majority opinion. See Maj. Op. at 857-58.

. The use of "A.” throughout this- opinion indicates citation to the Appendix for Appellant.