**2026 WI 5**

# Supreme Court of Wisconsin



STATE OF WISCONSIN,
*Plaintiff-Respondent-Petitioner,*

*v.*

J.D.B.,
*Defendant-Appellant.*

No. 2023AP715-CR
Decided February 25, 2026

REVIEW of a decision of the Court of Appeals
Milwaukee County Circuit Court (Milton L. Childs Sr., J.) No.
2022CF3407.

BRIAN K. HAGEDORN, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., and ANNETTE KINGSLAND ZIEGLER, REBECCA GRASSL BRADLEY, REBECCA FRANK DALLET, and JANET C. PROTASIEWICZ, JJ., joined. SUSAN M. CRAWFORD, J., filed a dissenting opinion.

¶1 BRIAN K. HAGEDORN, J. In *Sell v. United States*, the United States Supreme Court held that a state may, within certain limits, forcibly "administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial." 539 U.S. 166, 179 (2003). The state may only do this, however, if: 1) "important governmental interests are at stake"; 2) "involuntary medication will significantly further" those interests; 3) "involuntary medication is necessary to further those interests"; and 4) "administration of the drugs is medically appropriate." *Id.* at 180–81 (emphasis omitted).

Wisconsin's involuntary medication statutes do not yet reflect and adopt these four *Sell* factors. However, we have held that a lawful involuntary medication order must satisfy the *Sell* factors in addition to the statutory requirements for restoring competency for trial. *State v. Fitzgerald*, 2019 WI 69, ¶2, 387 Wis. 2d 384, 929 N.W.2d 165.

¶2 The defendant in this case, whom we will call Jared,[1] was charged with battery to a law enforcement officer. The circuit court ordered involuntary medication so Jared could be competent to stand trial. It concluded that the statutory requirements along with the *Sell* factors were satisfied. The court of appeals reversed, concluding that none of the *Sell* factors were established and the circuit court's findings on the statutory requirements were clearly erroneous. We granted review and now reverse.

¶3 This case requires us to articulate the proper standard of review on appeal for the *Sell* factors and to determine whether that standard was met under the facts of this case. We hold that the first *Sell* factor, whether the state has an important governmental interest, is an issue we review de novo. The remaining three *Sell* factors are fact questions entrusted to the circuit court in the first instance and will not be disturbed unless they are clearly erroneous. Using this framework, we affirm the circuit court's decision on the *Sell* factors. We further conclude the circuit court's findings under WIS. STAT. § 971.14(3)(dm) and (4)(b) were not clearly erroneous. Therefore, based on the record in this case, we reverse the decision of the court of appeals and uphold the involuntary medication order.

## I. BACKGROUND

¶4 According to the criminal complaint filed against him, Jared's mother called the police in August 2022 and reported that Jared was threatening to obtain a gun and kill everyone at his home. When officers arrived, Jared threatened the officers and punched one of the officers in the face. Jared was arrested and charged with battery to a law enforcement officer in violation of WIS. STAT. §§ 940.203(2) and 939.50(3)(h), a Class H felony.

---

[1] "Jared" is a pseudonym.

¶5     The first time Jared appeared in court, the circuit court ordered a competency evaluation after being advised by the defense that there was reason to believe he was not competent to proceed with the case. The Wisconsin Department of Health Services (DHS) conducted the evaluation. Jared was diagnosed with schizophrenia and found incompetent to proceed and unable to assist in his own defense. He was appointed counsel from the state public defender. Based on DHS's findings, the circuit court committed Jared to a mental health institution for treatment. He was held at the Milwaukee County jail from August 2022 until January 2023. While there, Jared did not consistently take the psychotropic medication he had been prescribed.

¶6     After being moved to the mental health institution in January, Jared did take his medications regularly. On April 3, however, he began refusing to take his prescribed antipsychotic drugs, and problems soon arose. Jared charged at staff, defecated on the floor, smeared and threw feces, and spit at others. Dr. Illichmann, who works for DHS, moved the circuit court to involuntarily medicate Jared. The circuit court held a hearing and granted the motion. The evidence before the circuit court consisted largely of Dr. Illichmann's report, his recommended treatment plan, and his testimony at the hearing. It also included information from Jared's previous competency reports. We cover this evidence and the specific circuit court findings in more detail below. But suffice it to say for now, the circuit court concluded the legal prerequisites, including all four *Sell* factors, were satisfied and ordered involuntary medication to render Jared competent for trial.

¶7     Jared appealed the involuntary medication order on the grounds that neither the statutory nor constitutional standards were met. In a published decision, the court of appeals reversed. The State petitioned this court for review, which we granted.

## II. DISCUSSION

### A. OVERVIEW AND ISSUES FOR REVIEW

¶8     Rooted in the Fourteenth Amendment's Due Process Clause, the United States Supreme Court has identified "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). This "constitutionally protected liberty interest" may be overcome, however, when the State has

an "essential" or "overriding" interest. *Sell*, 539 U.S. at 178–79 (citation modified).

¶9    When a mentally ill defendant is facing serious criminal charges, rendering that defendant competent to stand trial can constitute a sufficiently important interest, "but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." *Id.* at 179. The U.S. Supreme Court then broke this down into the factors a court must find as prerequisites to ordering involuntary administration of psychotropic medication, now known as the four *Sell* factors. *Id.* at 180–81.

¶10    In *Fitzgerald*, we held that Wisconsin's statutory provisions in WIS. STAT. § 971.14(3)(dm) and (4)(b) permitting involuntary medication for the purposes of rendering an accused competent to stand trial are unconstitutional to the extent they require a court to order involuntary medication without making the findings required by *Sell*. 387 Wis. 2d 384, ¶2. Therefore, courts issuing such orders need to comply with both the statutory requirements and make the findings mandated by the U.S. Supreme Court in *Sell*.

¶11    In this case, Jared contests both the constitutional and statutory bases for his involuntary medication order.[2] First, he challenges whether each of the four *Sell* factors was satisfied. This requires us to determine the meaning and application of each *Sell* factor. In addition, we must resolve the appropriate standard of appellate review for each

---

[2] While Jared's appeal was pending, the involuntary medication order expired. Therefore, the appeal of this order is moot. However, this court has been sensitive to the difficulty of timely appellate review in these cases and the need to address legal issues of statewide importance that would evade review with strict application of the mootness doctrine. *See, e.g., State v. Fitzgerald*, 2019 WI 69, ¶¶21–22, 387 Wis. 2d 384, 929 N.W.2d 165; *Winnebago Cnty. v. C.S.*, 2020 WI 33, ¶11 n.5, 391 Wis. 2d 35, 940 N.W.2d 875. In addition, neither party at this stage of review makes a vigorous argument for dismissing this case on mootness grounds. Instead, both ask us to clarify these pressing and disputed issues of law. Therefore, we choose to address the merits in this case.

factor—an issue left unaddressed by the United States Supreme Court and key to how appellate courts in Wisconsin will review such challenges moving forward. Second, Jared challenges whether the State proved the statutory requirements in WIS. STAT. § 971.14(3)(dm) and (4)(b), which relate to whether Jared lacked an understanding or an ability to apply an understanding of the advantages and disadvantages of treatment.

### B. *SELL* FACTORS

#### 1. Sell *Factor 1: Important Government Interest*

##### a. Overview

¶12    *Sell* first requires a court to "find that *important* governmental interests are at stake." 539 U.S. at 180. When someone is accused of a serious crime—whether against a person or property—bringing them to trial meets this threshold; it is an important governmental interest. *Id*.

¶13    But even if a serious crime is present, "Special circumstances may lessen the importance of that interest" in a particular case. *Id*. By way of example, *Sell* observed that if a defendant is facing a lengthy mental commitment in an institution, the state's interest in incarcerating an individual would be diminished (though not extinguished), presumably because the risk of re-offense is limited by the prospective mental commitment. *Id*. Similarly, the state's interest could also be lessened if a defendant has already served a lengthy confinement for which he will receive significant credit toward any ultimate sentence resulting from the prosecution. *Id*. The Court also reiterated, however, that delayed prosecution affects the government's substantial interest in prosecuting criminals on a timely basis. *Id*.

¶14    The first *Sell* factor is not a two-part test; it is a single unified question. *Id.* In general, if a defendant is charged with a serious crime, the state has an important interest in bringing that defendant to justice via prosecution. *Id.* By using the language "*special* circumstances," the Court communicated that such mitigating circumstances will not be ordinary. The ultimate legal determination does not consist in a checkbox of "special circumstances" with fixed rules; *Sell* asks whether the state has an important interest that is not sufficiently mitigated so as to become unimportant considering "the facts of the individual case." *Id.* Again, the question is whether the state has an interest in prosecution that is

important enough to override the defendant's liberty interest against unwanted medication. A serious crime is ordinarily enough to find an important interest. *Id.* ("The Government's interest in bringing to trial an individual accused of a serious crime is important.").

### b. Standard of Review

¶15     The standard of review an appellate court applies to a particular question is essential to the decision-making process. It deals with "apportion[ing] power and, consequently, responsibility between trial and appellate courts for determining an issue or a class of issues." *Utah v. Thurman*, 846 P.2d 1256, 1265–66 (Utah 1993). Standards of review generally fall into three categories: questions of fact, questions of law, and discretionary decisions. Ronald R. Hofer, *Standards of Review-Looking Beyond the Labels*, 74 MARQ. L. REV. 231, 233 (1991). In this case, we focus on the first two categories.

¶16     First, generally speaking, circuit courts are tasked with and institutionally competent to decide questions of fact. Determining what is true as a factual matter involves evaluating witnesses and evidence and otherwise making numerous credibility judgments based on both written and in-person evidence. *See State v. Owens*, 148 Wis. 2d 922, 929, 436 N.W.2d 869 (1989) ("The trial judge not only hears the testimony, but also sees the demeanor of the witness and the body language. As a result, the trial judge hears the emphasis, volume alterations and intonations. The trial judge also has a superior view of the total circumstances of the witnesses' testimony.").

¶17     Appellate courts, in contrast, review only a cold paper record, and are designed to ensure the decisions below were made in accordance with the law. Appellate courts do not substitute their own interpretation of the facts for those of the circuit court because we are—by design—not equipped to do so. *See id.* at 931. ("The trial court could gauge considerations not witnessed by the appellate court."); Hofer, *supra*, at 250 ("An appellate court cannot reproduce the decision making process if the initial decision was at all dependent upon the decision maker's sensory experience of the hearing or trial."). Rather, appellate courts are structured to deliberate and decide what the law is—matters determined by reference to legal authorities such as statutes, constitutions, and precedent, rather than the credibility of an expert witness, for example. *Thurman*, 846 P.2d at 1271 (Establishing norms for jurisdiction-wide application is "classically reserved to multi-judge appellate panels.").

¶18 For this reason, the general rule is that appellate courts defer to the factual findings made by circuit courts, disturbing them only when they are clearly erroneous. *See, e.g., State v. Burch*, 2021 WI 68, ¶14, 398 Wis. 2d 1, 961 N.W.2d 314; *see also* 5 C.J.S. *Appeal and Error* § 819 (2025). But purely legal questions are reviewed de novo, relying as necessary on the circuit court's underlying factual findings. *See, e.g., Serv. Emps. Int'l Union Healthcare v. WERC*, 2025 WI 29, ¶5, 416 Wis. 2d 688, 22 N.W.3d 876; *see also* 5 C.J.S. *Appeal and Error* § 821 (2025).

¶19 This is simple enough in many cases, but much harder in others. Sometimes, a component of a legal question is necessarily intertwined with credibility and factual judgments that are hard to separate. *See* Hofer, *supra*, at 244 (highlighting classic problem with identifying which parts of a mixed question are law and which are fact); 5 C.J.S. § 823 (2025) (discussing how different courts assign weight to the facts and law in mixed questions). Where we do not have a legal authority that fixes the proper standard of review—such as a statute or U.S. Supreme Court precedent— we must determine the issue for ourselves. *State v. Byrge*, 2000 WI 101, ¶32, 237 Wis. 2d 197, 614 N.W.2d 477 ("[W]e note that whether an issue presents a question of fact or a question of law is in itself a question of law."); *see also* 5 C.J.S. *Appeal and Error* § 816 (2025). And although the considerations can vary, the core questions are generally centered on which court is better positioned to decide the question as a final matter, whether uniformity or flexibility is important in the rule's application, and whether factual or legal issues predominate. *See State v. Pepin*, 110 Wis. 2d 431, 435–36, 328 N.W.2d 898 (Ct. App. 1982); Hofer, *supra*, at 238–39; *Thurman*, 846 P.2d at 1271.

¶20 Turning back to this case, the first *Sell* factor—whether the state has an important interest in prosecution—serves as a threshold question. The *Sell* test is aimed at ensuring the due process liberty interest against unwanted medication is protected. *Sell*, 539 U.S. at 178. With no sufficiently important interest in prosecution, the other factors, which are largely aimed at ensuring that the interest will be appropriately furthered, logically need not be addressed. In our view, this is a question where the fundamental legal question of whether this is sufficiently important predominates. It is true that mitigating special circumstances have a factual component to them—for example, how long someone has been confined pretrial. And while we defer to these sorts of underlying fact-findings, the determination under the first *Sell* factor is, in the main, one

focused on the broader governmental interest, not on the credibility determinations or judgments unique to factual findings.

¶21 To our knowledge, every court that has considered the appropriate standard of review on this factor, along with both parties in this case, concludes it is a question of law, not a question of fact.[3] We are in accord and hold that the first *Sell* factor is subject to de novo review. An appellate court should rely on the specific factual circumstances of the defendant's situation as found by the circuit court when assessing the legal question: the impact those circumstances have on the strength of the interest.[4] An appellate court, therefore, reviews independently whether the crime is serious and whether any mitigating special circumstances diminish the strength of the interest such that it is no longer important enough to warrant forcible medication.

### c. Application to this Case

¶22 In this case, the parties agree that Jared is charged with a serious crime. We agree; felony battering of a law enforcement officer certainly satisfies any definition of serious. Despite their agreement, both parties suggest we adopt a framework for determining if a crime is serious—in effect asking for guidance on how cases with different facts might come out. We decline the invitation. As a general rule, courts should decide what is necessary to adjudicate the legal matters in dispute, not those that might be disputed in a future case.[5]

---

[3] *United States v. Gomes,* 387 F.3d 157 (2d Cir. 2004); *United States v. Grape,* 549 F.3d 591 (3d Cir. 2008); *United States v. Evans,* 404 F.3d 227 (4th Cir. 2005); *United States v. Palmer,* 507 F.3d 300 (5th Cir. 2007); *United States v. Green,* 532 F.3d 538 (6th Cir. 2008); *United States v. Fieste,* 84 F.4th 713 (7th Cir. 2023); *United States v. Fazio,* 599 F.3d 835 (8th Cir. 2010); *United States v. Hernandez-Vasquez,* 513 F.3d 908 (9th Cir. 2008); *United States v. Bradley,* 417 F.3d 1107 (10th Cir. 2005); *United States v. Diaz,* 630 F.3d 1314 (11th Cir. 2011); *United States v. Dillon,* 738 F.3d 284 (D.C. Cir. 2013).

[4] *See Fieste,* 84 F.4th at 720 ("We review these embedded factual findings relevant to the court's legal conclusion for clear error."); *accord Dillon,* 738 F.3d at 291; *Evans,* 404 F.3d at 236 ("[W]e review any factual findings relevant to this legal determination for clear error.").

[5] *See State v. Steffes,* 2013 WI 53, ¶27, 347 Wis. 2d 683, 832 N.W.2d 101 ("[T]his court does not issue advisory opinions on how a statute could be

¶23    Thus, given the undisputed seriousness of this crime, the State has an important interest in prosecuting Jared unless special circumstances sufficiently undermine that interest. The parties debate whether Jared was required to raise any special circumstances in the circuit court, or whether that burden falls on the circuit court or the state. This is a more complicated matter here because nobody raised any special circumstances for the circuit court to consider. And other courts have found that the failure to raise these issues can constitute forfeiture. *United States v. Dillon*, 738 F.3d 284, 293 (D.C. Cir. 2013); *see also United States v. Fieste*, 84 F.4th 713, 722–23 (7th Cir. 2023) (collecting cases finding forfeiture). Nonetheless, we need not decide this question at this stage because none of the purported special circumstances Jared does raise before us are sufficient to undermine the State's interest.

¶24    First, Jared contends the prosecution could result in a verdict of not guilty by reason of insanity (NGI). He argues this would mitigate the State's interest in criminal punishment because, in such a scenario, he would not be criminally punished for his crimes. We disagree. By its nature, the NGI defense can be raised only within the confines of the prosecution itself. Put simply, a defense to prosecution cannot be the very reason to forgo prosecution in the first place. *United States v. Mikulich*, 732 F.3d 692, 701 (6th Cir. 2013) ("It is thus logically backwards to say that a potential insanity defense may somehow lessen the value of the condition precedent [prosecution] coming to pass in the first instance."). We cannot see how a possible NGI defense would diminish the State's interest in prosecuting a serious crime.

¶25    Second, Jared maintains he was improperly denied bail and subject to illegal pretrial detention. But Jared does not connect the dots on why this alleged legal error—which can be independently raised and argued—is relevant to the State's interest in the prosecution itself. He names the issue but does not explain its supposed mitigating effect.

¶26    Third, Jared says he did not receive adequate and timely treatment, potentially raising a constitutional due process violation. And

---

interpreted to different factual scenarios in future cases. Rather, it is our job to adjudicate the dispute in front of us. It is thus not necessary for us to resolve the hypotheticals laid out by [the petitioner]." (citation modified)).

because the State did not provide him care more quickly, the State's interest in prosecuting him for his behavior is diminished. We once again fail to see the connection. The government's interests in treatment and prosecution are not one and the same. Prosecution is aimed at justice for the community and crime victims; its goals may permissibly include punishment for wrongdoing, protection of the community, and deterring future crimes by both the offender and others. It is possible the state's mental health system could have done better, but we do not understand why this would diminish the State's far broader interest in criminal justice, which extends significantly beyond Jared's mental health needs. Absent such a connection, we cannot conclude that Jared showed the State's interest in prosecution was diminished by the length of time it took him to begin receiving treatment.

¶27 Fourth, Jared contends his actions were the result of a mental health crisis. Jared was only 19 and had no criminal history, and thus concerns for his behavior could be addressed through a future mental health commitment rather than a long sentence. All of this, Jared contends, diminishes the State's interest in prosecution. But once again, he does not explain why. Every ch. 971 proceeding involves a person struggling with mental health challenges. Against this argument, we must consider the words of *Sell* itself: civil commitment is not "a substitute for a criminal trial." 539 U.S. at 180. Again, criminal prosecution is aimed at far more than the perpetrator's wellbeing. Jared may be attempting to mirror *Sell's* reasoning that he is likely to be civilly committed for a long time and therefore criminal punishment is less important. If this were true, that would serve a mitigating effect. However, at the time the circuit court made the decision we are reviewing, this was unclear at best. The ch. 51 proceeding, a separate, non-criminal civil involuntary commitment proceeding, had not yet begun. We find that, on this record, the mere possibility that Jared may have faced a future commitment at the time the circuit court made its decision does little to undermine the State's interest in prosecuting Jared for this serious crime.

¶28 Finally, Jared suggests he was unlikely to receive a long sentence, and the eight months he spent in custody would likely cover substantially all of his sentence. *Sell* recognizes that lengthy pretrial confinement can serve as a mitigating effect on the State's interest. The parties debate whether we must compare Jared's eight-months pretrial confinement to his likely sentence or a potential maximum sentence— here, six years. However, *Sell* does not commend rigid rules with fixed formulas. Yes, a portion of Jared's potential sentence may already have

been served given his pretrial commitment. This has a mitigating effect on the State's interest because some of the penological goals of criminal prosecution will have been accomplished already. But Jared could still face further consequences for his behavior. What Jared misses, and our analysis emphasizes, is that criminal prosecution serves interests far beyond Jared himself. Thus, while his pretrial confinement does undermine the State's interest to some degree, it is not so strong as to remove the State's strong interest in prosecuting this serious crime.

¶29    All in all, while Jared's pretrial confinement has a mitigating effect, we nonetheless conclude Jared's charged crime is serious, and the State has an important interest in prosecuting Jared for his conduct. Jared does not present special circumstances that serve to eliminate the State's important interest in prosecution. Reviewing this question of law, we conclude the first *Sell* factor is satisfied.

2.  Sell *Factor 2: Significantly Further the State's Interest*

a.  Overview

¶30    The second *Sell* factor requires a court to find that involuntary medication *significantly furthers* the government's interest in prosecuting the offense. *Id*. at 181. To significantly further the government's interest, the medication the State seeks to administer must do two things. It must be "substantially likely to render the defendant competent to stand trial" and be "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id*. Note that the goal of this factor is all about the efficacy of the medicine in ensuring a fair trial. If the medical treatment is just a shot in the dark, for example, having only a marginal possibility of restoring competency, it would not satisfy this standard. To say it another way, if the government is going to forcibly medicate a defendant to render him fit for trial, the treatment should be substantially likely to do so, and substantially unlikely to harm his ability to assist in his defense.

¶31    We must also address an opinion from the court of appeals which has been understood as mandating a list of specific requirements that must be present to satisfy this and other factors. In *State v. Green*, the court of appeals considered a challenge to an involuntary medication order under dramatically different circumstances. 2021 WI App 18, ¶1, 396 Wis. 2d 658, 957 N.W.2d 583. There, the State's expert medical witness on

the treatment plan met with the patient once, and only for an hour. *Id.*, ¶3. He did not know or review the patient's medical history or treatment records. *Id.*, ¶32. He wasn't even responsible for the defendant's medication. *Id.*, ¶21. The treatment record submitted to the court was a generic one, and the doctor testified that the patient's specific comorbidities and needs would be evaluated after a further assessment by medical staff. *Id.*, ¶22.

¶32 The court of appeals rightly stressed that a generic treatment plan not tailored to the individual was insufficient. *Id.*, ¶34. Rather, to prove *Sell* factors two, three, and four, the State must present an individualized treatment plan tailored to the individual the State is seeking to medicate. *Id.* But then the court of appeals went on to outline a broader itemization of evidentiary requisites: the specific medication, the maximum dosages, the overall duration of the treatment, how the plan applies to the particular defendant, the defendant's age, the defendant's weight, the duration of the defendant's illness, the defendant's past responses to psychotropic medications, the defendant's cognitive abilities, the defendant's current list of medications, and the defendant's medical record. *Id.*, ¶38.

¶33 We understand the problem *Green* was responding to. Given that a generic plan is insufficient, most of this information seems a natural part of an individually-tailored medication plan. However, to the extent *Green* is understood as creating a mandatory checklist, we see no such specificity in *Sell* itself. At this stage of the analysis, the State's important interest in prosecution has already been established. This finding is therefore focused in a more limited fashion on whether the treatment will prove effective for purposes of trial. While evidence tailored to the defendant is required, *Sell* does not demand the kind of specificity that Jared argues *Green* requires. It is not clear whether *Green* meant to require each and every piece of information it lists. To the extent it did, it is overruled. *Sell* mandates individualized findings about the defendant's medical situation, but it permits flexibility in how this finding is determined and the evidence that might support it.

## b. Standard of Review

¶34 Unlike the first factor, this factor requires a factual determination and weighing of how likely a given treatment plan is to help, and not to harm the defendant. This necessarily requires making credibility assessments, evaluating testimony at the hearing, engaging in a

careful consideration of expert reports, and otherwise sifting the evidentiary wheat from the chaff to determine whether the proposed medicines will accomplish their purpose with acceptably minimal side effects. This is work "where the [trial] court's comparative expertise is at its zenith and ours its nadir." *United States v. Tucker*, 60 F.4th 879, 888 (4th Cir. 2023). The findings required under this second *Sell* factor are therefore best evaluated as the conclusions of a factfinder, not the kind of pure legal question of which an appellate body is no less capable.

¶35   Therefore, we join the overwhelming majority of courts and conclude that the finding required under the second *Sell* factor is given to the judgment of the circuit court as the trier of fact.[6] We will disturb this factual finding only if it is clearly erroneous. This means that "as long as the evidence would permit a reasonable person to make the same finding," it will be affirmed on appeal. *State v. Wiskerchen*, 2019 WI 1, ¶30, 385 Wis. 2d 120, 921 N.W.2d 730. This is true "even if the evidence may have presented competing factual inferences." *Id.* "We search the record not for evidence opposing the circuit court's decision, but for evidence supporting it." *Id.*

c.  Application to this Case

¶36   Given our standard of review, we observe that the circuit court made the required findings. The circuit court entered its findings that the medication was "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that undermine the fairness of the trial by interfering significantly with the defendant's ability to assist counsel in conducting a trial defense."

¶37   In applying our deferential standard of review, we conclude this reflects a reasonable view of the evidence. The circuit court had the benefit of a hearing on the motion for an involuntary medication order. The written treatment plan was included as an attachment to the motion itself. The treatment plan included a certification from the doctor that "to a reasonable degree of medical certainty" the medication was medically

---

[6] *See supra* ¶21 n.3; *see also Dillon*, 738 F.3d at 291 (collecting cases); *accord Fazio*, 599 F.3d at 839 ("[T]he overwhelming majority of courts have held Sell factors two through four present factual questions subject to clear error review.").

appropriate and likely to help restore Jared to trial competency. It is true that the treatment plan suggested Jared had no physical health conditions, which contradicts other reports in the record before us.[7] Even so, Jared's doctor (Dr. Illichmann) offered uncontested testimony at the hearing that he reviewed Jared's medical records including a former competency report and that he also discussed with Jared the medications on the written treatment plan and their side effects. He also testified about each drug on the plan, why he would prescribe it, and what the side effects were. The basic throughline of his testimony was that the antipsychotic drugs he chose help with psychosis and have relatively minor side effects. Specifically, Dr. Illichmann testified that the medication would ameliorate symptoms of Jared's mental illness and decrease symptoms.

¶38    Jared counters that Dr. Illichmann's proposed treatment plan and testimony state only that the named pharmaceuticals help people like Jared—those with psychosis—rather than Jared himself.[8] However, magic words are not necessary. The circuit court could reasonably infer from this testimony that Dr. Illichmann thought the medications would also help Jared himself. Indeed, it's clear that's exactly what this testimony meant.

---

[7] Beyond his psychosis, Jared had a complicated medical history. A portion of his skull was removed to make space for brain swelling resulting from a self-inflicted gunshot wound. He also has impaired vision, weakness on his left side, hypertension, diabetes, and takes medication for seizures. He also suffers from depression and suicidal ideation.

[8] Along similar lines, Jared argues that the treatment plan is not specific enough to him to pass constitutional muster. He points out that the treatment plan would allow for any dose within the FDA approved range for the listed medications. He largely relies on the notion that all of *Green*'s specific requirements are necessary—a reading of *Sell* we reject. In this case, it was not erroneous for the circuit court to conclude that the plan was sufficiently specific. Dr. Illichmann explained to the circuit court that doctors will slowly adjust the dose (called "titrating") to a level that the patient responds to. When opposing counsel questioned the doctor about some of the proposed medications during cross-examination, Dr. Illichmann explained the specific doses he intended to start with to see how Jared would respond. However, Jared began refusing his medication before Dr. Illichmann could fully treat Jared. Based on this testimony, it was reasonable for the circuit court to conclude that the plan was specific to Jared, even with a broad range of doses indicated on the paper treatment plan submitted to the court.

Dr. Illichmann reviewed and considered Jared's medical history and records, met with him five times, and discussed the specific medicine he would start Jared on. The circuit court weighed the evidence, which included Dr. Illichmann's testimony along with the other reports submitted to the court, and the reasonable inferences that followed. There were competing inferences available, but reasonable people could come to the circuit court's conclusion with the evidence before it. The evidence sufficiently supports the circuit court's findings that this course of treatment was substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that undermine the fairness of the trial. These findings are not clearly erroneous.

### 3. Sell *Factor 3: Necessity*

#### a. Overview

¶39 The third *Sell* factor requires the court to find that the medication is *necessary* to further the important governmental interest in bringing the accused to trial. 539 U.S. at 181. This means the court must determine that treatments other than medication and methods of administering medication less intrusive than involuntary medication— such as nondrug therapies and a contempt order for not taking medication, respectively—are not available. *Id*.

#### b. Standard of Review

¶40 Like the previous factor, this finding is predominantly a medical conclusion, not a legal one. It can only be assessed by a careful, credibility-focused assessment of the written evidence and hearing testimony. This is exactly the kind of factual inquiry within the expertise of the circuit court, rather than the impersonal paper review done by appellate courts. We will therefore overturn this circuit court finding only if it is clearly erroneous. This standard of appellate review is likewise the approach adopted by nearly every other court to address this question. [9]

---

[9] *See supra* ¶21 n.3, ¶35 n.6.

#### c. Application to this Case

¶41 The circuit court found that involuntary medication was necessary based on the doctor's testimony that no less intrusive alternative would help return Jared to trial competency. Specifically, Dr. Illichmann testified that Jared was already refusing medication; accordingly, voluntary use was not likely to restore Jared to trial competency. The only alternative, he said, was to hope that Jared would take his medications voluntarily. If he didn't, and there was no "random improvement," then DHS "would probably have to submit to the Court that the patient is not competent and not likely to be restored to competency." In other words, without the medication, and the medication administered against Jared's will, the State would never be able to prosecute Jared. The doctor's testimony was clear and uncontested, and the circuit court's finding based on this evidence is entitled to our deferential review. We conclude this finding is not clearly erroneous.

### 4. Sell *Factor 4: Medically Appropriate*

#### a. Overview

¶42 Under the fourth *Sell* factor, "the court must conclude that administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition." 539 U.S. at 181. While the second and third factors focus on the efficacy and need for the treatment in preparation for trial, the fourth factor inquires whether the treatment is in the defendant's best medical interest personally.

#### b. Standard of Review

¶43 No less than factors two and three, this finding requires the circuit court to assess the medical evidence adduced in the record and at the hearing to make a factual finding regarding what is best for the defendant. This will be based on the defendant's particular medical conditions and prescriptions for his well-being, and the credibility determinations that must be made to reach these conclusions. Again, this is predominantly a factual question that appellate courts are not well-positioned to second-guess. Therefore, like *Sell* factors two and three and for the same reasons, we will disturb the circuit court's finding only if it is

clearly erroneous. And once again, this accords with the approach adopted in other jurisdictions. [10]

### c. Application to this Case

¶44    On this factor as well, the circuit court made the requisite finding. It indicated that it found that "involuntary administration of medication(s) or treatment is medically appropriate." This is a reasonable conclusion from the evidence. The written treatment plan certified that "to a reasonable degree of medical certainty" the medication was medically appropriate. Dr. Illichmann testified that the proposed medications would be in Jared's medical interest by ameliorating and decreasing the symptoms of his mental illness. The doctor's testimony was clear and uncontested, and the circuit court's finding based on this evidence is entitled to our deferential review. We conclude this finding is not clearly erroneous.

¶45    Jared's counterargument that the medicine isn't in his best interest doesn't persuade us otherwise. He says that because of potential side effects related to his various health conditions—including diabetes and seizures—the treatment is not medically appropriate. He points out that the FDA website calls for caution when prescribing these medications to people with diabetes or seizures. In effect, Jared is asking us to reconsider the potential side effects that were part of our analysis for the second *Sell* factor. We deferred to the circuit court's finding that the medications were substantially unlikely to have side effects that undermine the fairness of the trial. The circuit court reasonably inferred that Dr. Illichmann thought the medication would help Jared. Dr. Illichmann was familiar with Jared's medical history and testified extensively about the potential side effects of the medication he proposed on the treatment plan. Given that it had information before it sufficient to support its conclusion, we will defer to the circuit court on this issue as well.

### 5. Sell *Factors Summary*

¶46    The U.S. Supreme Court has held that a defendant charged with a serious crime may be involuntarily medicated to render the

---

[10] *See supra* ¶21 n.3, ¶35 n.6.

defendant competent for trial. But given the liberty interest implicated, *Sell* held that a court must make four separate findings. First, the government must have an important interest. Second, involuntary medication must be substantially likely to restore the defendant to competency for trial, and substantially unlikely to cause side effects that might hinder the defendant's ability to assist in his defense. Third, in light of any available alternatives, involuntary medication must be necessary to bring the accused to trial. And fourth, involuntary medication must be in the best medical interest of the defendant.

¶47   The first *Sell* factor is a legal question an appellate court reviews de novo. The second, third, and fourth *Sell* factors are entrusted to the factfinder, and an appellate court will disturb these findings only if they are clearly erroneous.

¶48   In this case, we independently conclude—and agree with the circuit court—that the State has an important interest in prosecuting Jared for his serious crime of battery to a law enforcement officer. We further conclude that the circuit court's findings on *Sell* factors two, three, and four are not clearly erroneous based on the record in this case.

## C.  STATUTORY QUESTIONS

¶49   With the constitutional issue settled, we come to the final dispute between the parties—whether the State proved the statutorily-required incompetency findings. We review these findings to see if they are clearly erroneous. *See Byrge*, 237 Wis. 2d 197, ¶45. We observe initially that Jared's argument before us is different than that raised below. Before the court of appeals, Jared contended that the circuit court did not make the required findings, with a brief mention of whether the evidence could support those findings. The court of appeals concluded the circuit court did make the findings, but that they were clearly erroneous. Now, Jared argues that the State did not bear its burden to prove the statutory requirements for involuntary medication, based in large part on language from *Outagamie County v. Melanie L*, 2013 WI 67, ¶67, 349 Wis. 2d 148, 833 N.W.2d 607.

¶50   The statute provides in relevant part:

The defendant is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the

18

advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the defendant, one of the following is true:

**1.** The defendant is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.

**2.** The defendant is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

WIS. STAT. § 971.14(3)(dm).

¶51 Under this statute, before a court can order involuntary medication, the State must make a double showing. First, it must prove that the advantages and disadvantages of the medication were explained to Jared. Then, it must demonstrate that Jared lacks ability either to apply or to express his understanding of the advantages and disadvantages of the medication. The circuit court, while discussing the third *Sell* factor, found that Dr. Illichmann "talked to the defendant about the advantages and disadvantages to restore the defendant. And again, he felt the defendant did not understand."

¶52 The record supports these findings. Dr. Illichmann testified that he explained the advantages and disadvantages of the medication to Jared at two different meetings, and the purpose was "to discuss symptoms, medications, side effects." He went through all the medications and side effects and advantages of each one. Dr. Illichmann testified that "the most [Jared] would explain to me is that feeling he doesn't need [the medications]." Additionally, he said, "I believe [Jared] lacks ability to apply information about medications to himself or his situation. Mainly, when I tried to discuss the importance of medications, I will get the repeated answer that he feels he just doesn't need anything." Dr. Illichmann also said that Jared is not capable of understanding the advantages and disadvantages because he gave the same repeated response to the doctor's questions. Accordingly, Dr. Illichmann uncontestedly testified to explaining the advantages and disadvantages of the medication to Jared, and his view that Jared was not responsive to this

information. The circuit court relied heavily on the doctor's testimony in coming to its decision at the oral ruling.

¶53    Jared argues that under *Melanie L.*'s description of identical language from ch. 51, Dr. Illichmann needed to testify about his efforts to educate Jared and the frequency of those conversations, and that Dr. Illichmann did not sufficiently explain how he reached his conclusions. This comes from a section in *Melanie L.* giving an overview of the statutory scheme, and on a portion that was not at issue in that case. We do not read *Melanie L.* as adding new, mandatory evidentiary standards to the statute. The circuit court made sufficient findings on the statute, and the evidence supports the finding that the statutory standards were met. Accordingly, its findings were not clearly erroneous. For its part, the court of appeals agreed the findings were made, but seemed to take a skeptical view of the testimony rather than deferring to the circuit court as factfinder. But applying the proper standard of review to the findings of fact, we affirm the circuit court's findings.

## III.  CONCLUSION

¶54    Before entering an order for involuntary medication for restoration for trial competency under ch. 971, circuit courts in Wisconsin must evaluate the four *Sell* factors and the statutory requirements. In this case, the circuit court correctly concluded that the government had an important interest in prosecuting Jared. The evidence also supports its factual findings that involuntary medication would significantly advance that interest, that involuntary medication was necessary to accomplish that interest, and that it would be medically appropriate for Jared. There was also sufficient evidence supporting the circuit court's conclusion that the statutory elements were satisfied. For these reasons, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

SUSAN M. CRAWFORD, J., dissenting.

¶55     This case began with an emergency call for help by a woman who reported that her mentally ill 19-year-old son, Jared, had threatened to get a gun and kill everyone in their home. The police response to that call escalated into a felony charge. Jared, in the throes of a mental health crisis, struck one of the responding officers in the face. The State arrested him and charged him with battery to a law enforcement officer. I disagree with the majority's conclusion on the first factor from *Sell v. United States*, 539 U.S. 166 (2003). I would hold that the State's interest in rendering Jared competent to stand trial on the battery charge was insufficient to overcome Jared's liberty interest in avoiding the forced administration of psychotropic drugs. Accordingly, I would affirm the court of appeals' decision and reverse the circuit court's order authorizing the involuntary administration of medication.

¶56     I would reach the merits of Jared's claim despite my concern that a central issue he raises in this appeal—whether special circumstances undermined the State's interest in prosecuting him—was not raised in the circuit court. He arguably forfeited appellate review of the issue. Moreover, the case is moot because the order committing Jared for treatment in the criminal case has expired. Nevertheless, I believe it is appropriate to decide this case on the merits (as the majority does) for several reasons. First, there are important liberty interests at stake that warrant this court's full review. Further, as the majority holds, our review of the first *Sell* factor is de novo, and the record is sufficiently developed to allow a thorough assessment of this factor. Finally, the Supreme Court in *Sell* reversed an order for involuntary medication after concluding that specific circumstances *not considered* by the lower courts undermined the government's interest in prosecuting Sell. 539 U.S. at 186. I similarly conclude that the record here shows that the circuit court overlooked special circumstances that outweighed the State's prosecutorial interest in bringing Jared to trial.

¶57     On appeal, the parties agree that the charged crime of battery to a police officer[1] is a serious one for the purposes of the first *Sell*

---

[1] The maximum penalty for the crime of battery to a law enforcement officer, as a class H felony, is a six-year bifurcated sentence, with a maximum term of confinement in prison of three years, plus up to three years of extended supervision. *See* WIS. STAT. §§ 940.203(2), 939.50(3)(h), 973.01(2)(b)8.

factor, but they disagree whether that interest was diminished by the special circumstances present in this case. Jared conceded on appeal that the crime charged was serious, arguing that special circumstances undermine the State's interest in forcibly medicating him for the sole purpose of rendering him competent to stand trial. I note that the Sixth Circuit has questioned whether the government's interest in prosecuting a crime carrying a maximum sentence of five years is sufficiently weighty to warrant forcibly medicating a defendant to restore competency. *See United States v. Berry*, 911 F.3d 354, 360–62 (6th Cir. 2018) (expressing doubt whether a five-year maximum sentence was "serious enough" to support an order to compel medication, but reversing on grounds that the government's interest was mitigated by other circumstances). I have a similar concern in this case, which involves a crime with a maximum term of confinement of three years. In any event, in weighing a state's interest in prosecution against a defendant's liberty interest in avoiding forced medication, we should weigh the *relative* strength of a state's interest in prosecuting a crime against the impact of special circumstances. A state's interest in prosecuting a more severe crime (such as a homicide) is considerably weightier than its interest in prosecuting a relatively less severe crime (such as a battery). Accordingly, I assume here that battery to a law enforcement officer is a sufficiently serious crime to warrant evaluating whether special circumstances diminish the State's interest in prosecuting Jared for that crime under the first *Sell* factor.

¶58    Notwithstanding that the charge is a serious one, I conclude that the State's interest in prosecuting Jared, under the particular circumstances here, is not strong enough to warrant forcibly medicating him for the sole purpose of rendering him competent to stand trial on the charge. I focus on two circumstances that undermine the State's interest in obtaining a conviction: the likelihood of a civil commitment and the duration of Jared's pretrial confinement. These circumstances undermine the State's interest in prosecuting Jared to the point that forcibly medicating him for the sole purpose of bringing him to trial on the battery charge violates Jared's rights under the Due Process Clause.

¶59    The following summary of the alleged crime and subsequent procedural history provides the factual context for this discussion. As alleged in the complaint, the police were dispatched to Jared's residence after his mother called 911, reporting Jared's threats to obtain a gun and kill everyone in their home. The officers went inside and spoke with Jared. He threatened to fight them. As the officers arrested Jared for threatening them, he struck one of them in the face, causing a laceration. Following his

arrest, Jared was taken directly to the hospital "for his expression of homicidal thoughts." The next day, he was charged with battery to a law enforcement officer, a felony. Three days later, he was booked into the Milwaukee County Jail.

¶60    At the time of his arrest, Jared was 19 years old and had no criminal history. He had significant mental and physical health challenges. Diagnosed with schizophrenia and major neurocognitive disorder, Jared had received inpatient psychiatric treatment on several occasions. Jared had permanent brain damage, partial paralysis, vision impairment, speech impairment, and cognitive deficits, all the effects of a gunshot wound to the head, self-inflicted when Jared was an 11-year-old child. The initial competency evaluation notes that Jared "recently experienced psychiatric decompensation after he underwent a medication change . . . . Thereafter, he became increasingly aggressive and irritable."

¶61    The procedural history of this case shows that Jared languished in jail for several months awaiting treatment. After his arrest on August 23, 2022, Jared made his initial appearance in court, while in custody, on August 31, 2022. His attorney questioned his competency, and the court ordered a competency evaluation. Jared remained in jail awaiting evaluation. On October 11, 2022, after a hearing, the circuit court found Jared incompetent but likely to be rendered competent with treatment, and committed him to the Department of Health Services (DHS) for treatment. Jared was admitted to Mendota Mental Health Institution on January 25, 2023, about three and a half months after the court ordered the commitment for treatment, and five months after his arrest. Jared had been in jail for that entire period.

¶62    Jared initially took his medications voluntarily upon his admission to the institution, but he began refusing them on April 3, 2023. On April 11, 2023, a DHS psychiatrist requested a court order to involuntarily medicate him. On April 24, 2023, after a hearing, the circuit court amended the commitment order, adding an order for the involuntarily administration of medication. At that time, the commitment order had been in place for over six months and was due to expire on October 11, 2023.

¶63    More than eight months after his arrest, Jared's prosecution had not advanced beyond an initial appearance (indeed, even the initial appearance was not completed because Jared's competency was

immediately questioned). Jared remained incompetent to stand trial for battery to a law enforcement officer.

¶64 These facts are properly considered in evaluating whether the State's interest in this prosecution was strong enough to warrant an order to forcibly medicate Jared for the sole purpose of rendering him competent to stand trial. An order for involuntary medication is an intrusive measure that profoundly affects a person's liberty interests. *Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."). *Sell* instructs that a court "must consider the facts of the individual case in evaluating the Government's interest in prosecution." 539 U.S. at 180. This formulation indicates that courts must consider the totality of the circumstances in balancing the competing interests at stake. It does not attempt to predict, limit, or define what "special circumstances" may be present or relevant in a particular case. In *Sell*, the Court concluded that the government's interest in prosecuting Sell for over 60 counts of fraud and two counts of attempted murder was insufficient to outweigh Sell's liberty interests in avoiding forcible medication. *Id.* at 170, 186.

¶65 In weighing the government's interests against Sell's, the Court identified specific circumstances that mitigated the government's interest in prosecuting Sell. *Id.* at 186. The Court identified the likelihood of a "lengthy confinement in an institution for the mentally ill" as a factor that may "diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* at 180. While cautioning that a civil commitment is not "a substitute for a criminal trial," the Court recognized that a potential civil commitment may "affect[] . . . the strength of the need for prosecution." *Id.* In addition, the Court observed that the strength of the government's interest in prosecution may be lessened if a "defendant has already been confined for a significant amount of time," because the defendant "would receive credit toward any sentence ultimately imposed." *Id.*

¶66 Such circumstances are present here. If the circuit court had declined to order Jared forcibly medicated, a civil commitment would have been reasonably foreseeable, given the severity of Jared's mental illness and dysregulation. The medical reports show that Jared's aggression increased when his psychotropic medications were changed (prior to the incident resulting in his arrest) and later when he stopped taking his medications at the institution. While not a substitute for

prosecution, a civil commitment, which would focus on treatment, would likely "diminish the risks" posed by Jared's uncontrolled mental illness and concomitant aggression more effectively than a conviction and jail sentence. A civil commitment could include an order for involuntary medication if Jared were found not competent to refuse medication or if necessary to control his dangerousness. *See* WIS. STAT. §§ 51.20, 51.61(1)(g).

¶67    In addition, the State's interest in prosecuting Jared for battery to a law enforcement officer was subject to diminishing returns the longer Jared's pretrial confinement continued. At the time the court ordered Jared to be involuntarily medicated, Jared had been in custody for 245 days (over eight months). Even with an order for forced medication, it was likely Jared would not be rendered competent for several more months, and might not be rendered competent within the maximum commitment period of one year.[2] That time would be credited toward an eventual sentence if Jared were convicted. *See* WIS. STAT. § 971.14(5)(a)3. ("Days spent in commitment . . . are considered days spent in custody . . . ."). Jared argues, and the State does not really dispute, that as a first-time offender, he would likely have received a sentence for the crime well under the statutory maximum of three years of confinement. His youth and significant disabilities increase this likelihood. *See generally State v. Gallion*, 2004 WI 42, ¶44, 270 Wis. 2d 535, 678 N.W.2d 197 (holding that "the sentence imposed shall 'call for the minimum amount of custody or confinement which is consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant.'" (quoting another source)). The State instead argues that courts should consider only the potential maximum sentence for the offense in

_____

[2] The psychiatrist's report submitted with the request for involuntary medication shows that Jared voluntarily took his medications for about ten weeks (from the date of his admission until April 3, 2023). The March 28, 2023 competency update submitted by an institution psychiatrist reported Jared's continued dysregulated behavior, visual and auditory hallucinations, thought disorganization, and delusions, and concluded that "[t]here is insufficient data to indicate that the symptoms that initially precluded his competence have since abated with treatment." The doctor nevertheless remained of the opinion that Jared could become competent within the period of commitment, stating that there are "numerous medication changes that can be made in an effort to treat his symptoms of psychosis." The following week, Jared began refusing his medications and rapidly decompensated, prompting the request for the involuntary medication order.

determining how a defendant's time in custody affects its interest in obtaining a conviction. While I agree with the State that a court should not engage in a "mock sentencing" at a *Sell* hearing, the circuit court also need not ignore common sense and the real world. In considering the potential impact of time served in custody, the likely eventual sentence is relevant.[3] If convicted, Jared likely faced a sentence of months in jail, not years in prison, reduced by the time he had already spent in custody. A "time served" disposition was becoming an increasingly likely outcome at the time of the hearing on the request to forcibly medicate Jared. As noted, it was foreseeable at that time that, even if forcibly medicated, Jared would not be rendered competent for trial for many months, if at all. *Sell* makes it clear that such circumstances lessen a state's interest in forcibly medicating a defendant in an effort to render the defendant competent to stand trial.

¶68 In short, I disagree with the majority's conclusion that the State maintained a sufficiently important interest in prosecuting Jared, eight months after he was arrested and taken into custody, to warrant an

---

[3] While courts are split on this issue, I find persuasive the federal circuit courts that have held that, although the maximum penalty helps determine whether the crime charged is serious, the sentence range under the federal sentencing guidelines is relevant in evaluating the impact of credit for time served on the government's interest in prosecuting the crime. *See, e.g.*, *United States v. Berry*, 911 F.3d 354, 363 (6th Cir. 2018); *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007); *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008). These courts also consider individualized factors that bear on sentence length, such as the defendant's criminal record or lack thereof, in evaluating the government's interest. *See Valenzuela-Puentes*, 479 F.3d at 1226 ("The fact that Mr. Valenzuela-Puentes is a recidivist not only increases the possible sentence he faces if convicted, but also increases the government's interest in prosecuting him."); *but see United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005) (rejecting consideration of likely sentence under sentencing guidelines as "unworkable," and relying instead on maximum penalty as the measure of the government's interest; but vacating the forced medication order based on the government's failure to prove the second and fourth *Sell* factors). We do not have sentencing guidelines in Wisconsin. Nevertheless, courts and litigants can take into account the aggravating and mitigating factors that will typically result in a lighter sentence, versus a maximum period of incarceration, in evaluating the strength of the State's interest in prosecuting a defendant who has spent many months in custody unable to stand trial.

order to forcibly medicate him solely for the purpose of restoring his competency to stand trial. As instructed by *Sell*, I reach this conclusion by considering the facts of this individual case. I am persuaded that, by the time the State sought the order to forcibly medicate Jared, its interest had diminished to the point that the intrusion on his liberty was not constitutionally warranted. I would affirm the decision of the court of appeals and vacate the circuit court's order to the extent that it permitted the administration of involuntary medication.

¶69    Accordingly, I respectfully dissent.